

DS136449

# SEALED

**THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

CLERK US DISTRICT COURT
NORTHERN DIST OF TX
FILED

2022 FEB 10   AM 8: 52

DEPUTY CLERK_____ mb

UNITED STATES OF AMERICA *ex rel.*
DONALD REZNICEK AND COLLEEN
MCFARLAND,

       *Plaintiffs,*

    v.

DALLCO MARKETING, INC. D/B/A ADCO
INDUSTRIES; PHOENIX OPERATIONS,
L.P.; RAYMOND EUGENE DAVIS; XIAMEN
ATLANTIS MFC CO., LTD.; XIAMEN TAFT
MEDICAL CO., LTD.; FAR EAST
INDUSTRIES, INC.; AND JOHN DOES #1-
50, FICTITIOUS NAMES,

       *Defendants.*

Civil Action No. _____

# 8-22CV0332-G

**COMPLAINT FOR
FALSE CLAIMS ACT VIOLATIONS
UNDER 31 U.S.C. § 3729 *ET SEQ.***

**FILED UNDER SEAL PURSUANT TO
31 U.S.C. § 3730(b)(2)**

**JURY TRIAL DEMANDED**

## TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................ 1

II.     JURISDICTION AND VENUE ......................................................................... 3

III.    PARTIES ............................................................................................................. 3

        A.      Plaintiffs/Relators ................................................................................... 3

        B.      Defendants ............................................................................................... 4

                1.      The Importer Defendants ............................................................. 4

                2.      Additional Defendants ................................................................ 5

                3.      Other Parties................................................................................ 6

IV.     BACKGROUND INFORMATION ................................................................... 6

        A.      Customs Duties ....................................................................................... 6

        B.      The Importation Process ......................................................................... 7

V.      DEFENDANTS' SCHEME TO DEFRAUD THE UNITED STATES ........... 11

        A.      The U.S.-China Trade War and Its Effects on Importers ...................... 12

        B.      The Fraudulent Scheme ........................................................................ 15

VI.     DEFENDANTS CONSPIRED TO DEFRAUD THE UNITED STATES....... 20

VII.    CAUSES OF ACTION ..................................................................................... 22

                COUNT I (Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(G)) .............. 22

                COUNT II (Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(C)) ............. 22

VIII.   PRAYER FOR RELIEF ................................................................................... 23

IX.     JURY TRIAL DEMAND ................................................................................. 24

## COMPLAINT FOR FALSE CLAIMS ACT VIOLATIONS
## UNDER 31 U.S.C. § 3729

This is an action brought on behalf of the United States of America by Relators Donald Reznicek and Colleen McFarland, against Defendant Dallco Marketing, Inc. d/b/a ADCO Industries and Phoenix Operations, L.P., (collectively referred to herein as "ADCO"), Raymond E. Davis, Xiamen Atlantis MFC Co., Ltd.; Xiamen Taft Medical Co., Ltd.; Far East Industries, Inc.; and John Does #1-50, Fictitious Names, pursuant to the *qui tam* provisions of the False Claims Act, 31 U.S.C. §§ 3729-3733 ("FCA").

## I.      INTRODUCTION

1.      This is an action to recover damages and civil penalties on behalf of the United States arising from false statements and claims that Defendants knowingly presented, or caused to be presented, to the United States and its agents and intermediaries, in violation of the FCA.

2.      Relators bring this Complaint seeking damages and civil penalties against Defendants under the FCA based on Defendants' knowing and fraudulent evasion of millions of dollars of customs duties owed on goods imported from China.

3.      As part of their fraudulent scheme, which has lasted from 2019 through the present, Defendants have employed various fraudulent invoicing methods to deliberately and materially understate the value of their imports to U.S. Customs and Border Protection ("CBP"), a component of the U.S. Department of Homeland Security.  By understating the value of the imported products in fabricated invoices, Defendants have defrauded the United States out of millions of dollars in customs duties.

4.      Defendants' fraudulent scheme has been remarkably brazen in its simplicity. ADCO imports commercial products—such as dollies, shelves, and safety cutters—from China. ADCO then resells these products to companies throughout the United States.  The goods ADCO

1

imports are subject to customs duties. In order to avoid paying the required customs duties for their imported products, Defendants have deliberately understated the value of these products to CBP, resulting in smaller duty obligations and greater profits.

5.      Most of the products ADCO imports have been subject to tariffs and fees totaling approximately 4% to 6% of the product's value. However, amid escalating trade tensions with China, the United States imposed additional tariffs in September 2018 and again in mid-2019. These tariffs imposed additional duties of 10% and 25%, respectively, on top of the baseline duties and fees ADCO was required to pay to import its products.

6.      ADCO was faced with various alternatives. ADCO could increase the prices of its products, passing along part or all of the tariff amount to its customers—though it would risk of losing business. ADCO could keep its prices the same, absorbing the tariffs—though it would earn lower profits. ADCO could seek out suppliers from countries not subject to such high tariffs—though it would need to find new business partners, and its current supplier had a strong incentive to maintain their relationship.

7.      Defendants, including ADCO and its Chinese suppliers, hatched a scheme whereby the suppliers would pretend the goods they were shipping had dropped in value by forty to fifty percent. ADCO has paid the suppliers according to these reduced rates. Defendants have paid duties on these artificially reduced amounts, fraudulently decreasing their obligations to the United States. Later, ADCO's Chinese suppliers have sent a "dummy" invoice to ADCO, ostensibly for legitimate services, but in reality, a bill for the remaining forty to fifty percent of the cost of the goods that Defendants had hidden from CBP. After ADCO pays this invoice, the Chinese suppliers are made whole and ADCO has received its goods without paying the required duties. Defendants

2

thus have avoided the difficult business decisions wrought by the increased tariffs and maintained their levels of profit—all at the expense of the United States.

8.     In total, Defendants have defrauded the United States out of at least $1 million in customs duties they failed to pay.

## II.     JURISDICTION AND VENUE

9.     This Court has jurisdiction over the claims brought under the False Claims Act pursuant to 31 U.S.C. § 3730(a), and 28 U.S.C. §§ 1331 and 1345. Venue is appropriate in this District pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391(b) and 1391(c) because Defendants are located in this District, and a substantial part of the events or omissions giving rise to the claims occurred in this District.

## III.     PARTIES

### A.     PLAINTIFFS/RELATORS

10.     Relator/Plaintiff Donald Reznicek is an adult citizen of the State of Texas. Mr. Reznicek has been employed by Defendant ADCO since January 1, 1994. Mr. Reznicek currently serves as ADCO's manager of logistics and billing.

11.     Relator/Plaintiff Colleen McFarland is an adult citizen of the State of Texas. Ms. McFarland has been an employee of Defendant ADCO since 2005. Ms. McFarland currently serves as ADCO's bookkeeper.

12.     Relators have direct knowledge of the conduct alleged in this Complaint and conducted an independent investigation based on their experience and knowledge to uncover and report the fraud alleged herein.

13.     Accordingly, Relators are the "original source" of the non-public information alleged in this Complaint within the meaning of 31 U.S.C. § 3730(e)(4)(A)-(B).

3

14. Prior to the filing of this Complaint, Relators provided the government with written disclosure of substantially all material evidence and information that Relators possessed, in accordance with 31 U.S.C. § 3730(b)(2).

**B.  DEFENDANTS**

    **1.  The Importer Defendants**

        a.  Dallco Marketing Inc. d/b/a ADCO Industries

15. Defendant Dallco Marketing Inc. d/b/a ADCO Industries ("ADCO") is a Texas corporation with its principal place of business at 11333 Pagemill Road, Dallas, TX 75243. Founded in 1980, ADCO supplies EasyCut Safety Knife products, as well as dollies and shelving products.

        b.  Phoenix Operations, L.P.

16. Phoenix Operations, L.P. ("Phoenix") is a Texas Limited Partnership with its principal place of business at 11333 Pagemill Road, Dallas, TX 75243. Phoenix was established on June 8, 1998. It consists of one General Partner, Ray Davis, and four limited partners, all of whom are Ray Davis's children: Wilma Ann Davis, Virginia Ann Davis, Susan Clare Clevenger, and Raymond Michael Davis. Ray conducts personal and business transactions through Phoenix, including purchasing houses for his children and purchasing ADCO's headquarters. From approximately 2004 through the present, ADCO has transferred $35,000 per month to Phoenix, with $21,000 earmarked for rent for ADCO's headquarters and $14,000 earmarked for equipment rental.

        c.  Raymond Eugene Davis

17. Defendant Raymond Eugene Davis ("Davis") owns and operates Defendants ADCO and Phoenix Operations, L.P. Mr. Davis is an adult citizen of the State of Texas, and his place of residence is 139 Shepherds Glen Road, Rockwall, TX 75032.

4

18.   Defendants ADCO, Phoenix, and Davis are referred to collectively herein as the "Importer Defendants."

### 2.   Additional Defendants

#### a.   XTM

19.   Xiamen Atlantis MFC Co., Ltd. is a manufacturer and supplier of industrial products. The company is located at 63 Lian Shang Rd., Guankou, Jimei, Xiamen, China. Xiamen Taft Medical Co., Ltd. is a manufacturer and supplier of medical equipment and other products. The company is located at 65 Lian Shang Rd., Guankou, Jimei, Xiamen, China.   Far East Industries, Inc. ("Far East") is affiliated with both Xiamen Atlantis MFC Co., Ltd. and Xiamen Taft Medical Co., Ltd.  Far East is located at 4f, 169 Hong Chang 12 St, Taoyauan, Taiwan.  Both Xiamen Atlantis MFC Co., Ltd. and Xiamen Taft Medical Co., Ltd. conduct business through Far East, and ADCO's payments for these companies' products are remitted to Far East. All three of the aforementioned companies are referred to collectively herein as "XTM."  ADCO's exclusive point of contact with XTM has been Calvin Chang, a Chinese national.

20.   For the past several years, XTM has been nearly the exclusive supplier of goods to ADCO.  All of the products relevant to this Complaint were supplied by XTM.

#### b.   John Does Nos. 1-50, Fictitious Names

21.   John Does Nos. 1-50, Fictitious Names, are individuals, corporations, limited liability companies, partnerships, trusts, or other lawful business entities through which Defendants do business, and who are unknown co-conspirators who conspired with Defendants to perpetuate the scheme alleged herein.

22.   To the extent that any of the conduct or activities described in this Complaint was not performed by Defendants, but by the individuals or entities alleged herein as John Does Nos. 1-50, Fictitious Names, any reference herein to "the Defendants" or "Defendants" under such

5

circumstances, and only under such circumstances, refers also to John Does Nos. 1-50, Fictitious Names, and/or other co-conspirators who conspired with Defendants to perpetrate the scheme alleged herein.

23. As a result of Defendants' actions, the United States has suffered significant financial harm.

24. Defendants' conduct is ongoing.

### 3. **Other Parties**

25. BNSF Logistics International, Inc. ("BNSF") is a transportation and logistics company headquartered at 3200 Olympus Blvd., Suite 200, Dallas, TX 75019. Since at least 2010, the Importer Defendants have used BNSF as their customs broker.

26. In August 2021, BNSF merged with another company, Axiom Worldwide Logistix, Inc. ("Axiom"), headquartered at 4251 W. John Carpenter Fwy., Suite 100, Irving, TX 75063. Since August 2021, all of BNSF's business has been executed through Axiom, including the customs broker services for the Importer Defendants.

## IV. **BACKGROUND INFORMATION**

### A. CUSTOMS DUTIES

27. The Constitution grants Congress the power to impose duties and to regulate commerce with foreign nations. U.S. Const. art. I, § 8, cl. 1, 3. To that end, the government, requires importers of certain goods to pay customs duties—typically an *ad valorem* or per-item tax—to control the flow of goods and to regulate the economy. Whether an item is subject to customs duties and what the duty rate will be are determined by several factors, including the nature of the item, where it was made, and where it was shipped from.

28. Customs duty rates are published in the Harmonized Tariff Schedule ("HTS"), which contains a list of tens of thousands of numeric identifiers. These so-called "HTS codes" are

used to classify and define internationally traded goods.  In most cases, in order to import or export a product internationally, the traded good must be assigned an HTS code that corresponds with the HTS of the country of import.  U.S. HTS codes are administered by the U.S. International Trade Commission and are published in the Harmonized Tariff Schedule of the United States.

29.     An HTS code consists of two parts.  The first six digits correspond to the product's Harmonized Commodity Description and Coding System ("HS") Code, which is developed by the World Customs Organization.  The HS code identifies the category to which the product belongs, but does not assign any duty rates, as these are determined by each country of import.  A U.S. HTS code appends two or four digits to the HS code, adding a duty rate and sometimes a "statistical suffix" further classifying the product (but not affecting the duty rate).  For example, HTS code 0902.10.1015 is assigned to certified organic flavored tea.  The elements within this HTS code correspond to various elements of the product:

**09** – Chapter (Coffee, Tea, Mate, and Spices)

09**02** – Heading (Tea, whether or not flavored)

0902.**10** – Subheading (Flavored)

0902.10.**10** – U.S. HTS Code Subheading (used to establish duty rates)

0902.10.10**15** – Statistical Suffix (Certified Organic)

As demonstrated by this example, the applicable duty rate is determined by the fourth pair of digits in each HTS code—in this example, 6.4%.

**B.     THE IMPORTATION PROCESS**

30.     All merchandise imported into the United States is required to be "entered," unless specifically excepted.  19 C.F.R. § 141.4(a); 19 U.S.C. § 1484.  "Entry" means, among other things, that an importer or its agent must file appropriate documents with an officer of CBP that

7

allow the agency to assess the customs duties due on the merchandise being imported into the United States. 19 C.F.R. § 141.0a(a).

31.     The documents required to be filed with CBP in order to complete entry include a bill of lading or air waybill, a commercial invoice, and an entry summary (CBP Form 7501). *See, e.g.,* 19 C.F.R. §§ 141.11, 141.19(a), 141.81, 141.86(a), 142.3(a), 142.6(a).

32.     Pursuant to 19 U.S.C. § 1484, the entity serving as "importer of record" is responsible for paying the customs duty and using reasonable care in making and providing accurate documentation to CBP that allows the agency to assess the customs duties due on the merchandise. 19 U.S.C. § 1484(a)(1)(B).

33.     Generally, the importer of record is required to deposit estimated duties with CBP at the time of entry. 19 U.S.C. § 1505; 19 C.F.R. §§ 141.1, 141.101. In most cases, the amount of customs duty owed is equal to the value of the imported merchandise multiplied by the applicable duty rate. Sometimes, the amount of customs duty owed is assessed at a flat rate per item imported.

34.     The value or approximate value of the imported merchandise must be declared in the commercial invoice and entry summary. Federal law provides that every importer of record must file a declaration stating that the values set forth on these documents are accurate. 19 U.S.C. § 1485.

35.     Generally, importers of record are required to declare the "transaction value" of the goods, which is the price actually paid or payable for the merchandise plus, if applicable, certain additional costs incurred with respect to the merchandise. 19 U.S.C. § 1401a(a)(1)(A), (b).

36.     The entry summary form includes a declaration that "the statements in the documents herein filed fully disclose to the best of my knowledge and belief the true prices, values,

8

quantities . . . and are true and correct" and that the declarant "will immediately furnish to the appropriate CBP officer any information showing a different statement of facts."

37.      The Importer Defendants, like many other importers, use a customs broker to assist them in clearing goods for entry by preparing the entry summary and other necessary paperwork and calculating taxes and duties.  Since at least 2010, the Importer Defendants have used BNSF as their customs broker.

38.      BNSF completes the entry summary based on the information, including invoices, provided by the importer of record.  For example, on March 18, 2020, XTM submitted an invoice to ADCO for, *inter alia*, 10,944 EASYCUT 1000 BLUE boxcutters at a total value of $10,309.25, which were to be loaded on a vessel sailing for the United States on or about March 22, 2019:

### XIAMEN TAFT MEDICAL CO.,LTD
65 LIAN SHANG ROAD. GUANKOU, JIMEI, XIAMEN, CHINA
TEL: 86-592-5227285  FAX: 86-592-5227290  http://www.taft.com.cn  E-mail: afong44@126.com

## < COMMERCIAL  INVOICE >

| | | | | |
|---|---|---|---|---|
| **INVOICE NO.:**   CU005AO | | **DATE:** | **March 18, 2020** | |
| **INVOICE OF : AS BELOW** | | | | |
| **FOR ACCOUNT AND RISK OF MESSRS: ADCO INDUSTRIES** | | | | |
| 11333 PAGEMILL ROAD, DALLAS, TX.75243, U.S.A. | | **SAILING ON OR ABOUT:** | | |
| **SHIPPED PER:**   CMA COM G.WASHINGTON / 0TX5HE1MA | | **March 22, 2019** | | |
| **FROM: XIAMEN, CHINA** | | **TO: DALLAS,TX** | | |
| **DELIVERY TERM: FOB CHINA** | | **CURRENCY: USD** | | |

| ITEM NO. | DESCRIPTION OF GOODS | QTY | U/P | AMOUNT |
|---|---|---|---|---|
| | CONTAINER NO.: HMCU9019012 | | | |
| #99780S | EASYCUT 1000 BLUE | 10,944  Ea | 0.942 | 10,309.25 |

BNSF then completed an entry summary for this shipment.  The entry summary does not include the parties' internal item numbers and specific descriptions; rather, it includes HTS codes and the corresponding general descriptions for each product.  In this case, the entry summary showed that ADCO was importing 10,944 products under HTS Code 8211.93.0060, for knives (other) with other than fixed blades.  As required by CBP, the total value was rounded to the nearest dollar: $10,309.  These items were subject to a baseline duty of three cents per unit plus 5.4% of the total

value, as well as merchandise processing and harbor maintenance fees of 0.4714% of the total

value. In addition, these items were subject to the List 3 "article of China" HTS code, 9903.88.03,

which added a further 25% tariff. In total, BNSF reported that the Importer Defendants owed the

United States government $3,510 in duties and tariffs to import the boxcutters, and BNSF paid this

sum to the United States on or about April 22, 2020:



**DEPARTMENT OF HOMELAND SECURITY**
U.S. Customs and Border Protection

OMB APPROVAL NO. 1651-0022
EXPIRATION DATE 01/31/2021

### ENTRY SUMMARY

| 1. Filer Code<br>836-1040856-9 | 2. Entry Type<br>01 ABI/A | 3. Summary Date<br>04/22/20 | 4. Surety Number<br>036 | 5. Bond Type<br>8 | 6. Port Code<br>5501 | 7. Entry Date<br>04/10/2020 |
|---|---|---|---|---|---|---|
| 8. Importing Carrier<br>CMA CGM WASHINGTON (EGLV | | 9. Mode Of Transport<br>11 | 10. Country of Origin<br>CN | | | 11. Import Date<br>04/04/2020 |
| 12. B/L or AWB Number<br>EGLV146000082958 | | 13. Manufacturer ID<br>CNXIATAF6165XIA | 14. Exporting Country<br>CN | | | 15. Export Date<br>03/22/2020 |
| 16. I.T. Number<br>VVS06191332 | 17. I.T. Date<br>04/04/20 | 18. Missing Docs | 19. Foreign Port of Lading<br>57069 | | 20. U.S. Port of Unlading<br>2704 | |
| 21. Location of Goods/G.O. Number<br>V963/UNION PACIFIC RAILROAD | | 22. Consignee Number<br>SAME | 23. Importer Number<br>75-171066300 | | 24. Reference Number | |
| 25. Ultimate Consignee Name (Last, First, M.I.) and Address | | | | 26. Importer of Record Name (Last, First, M.I.) and Address<br>DALLCO MARKETING INC DBA ADCO INDUSTRIES<br>11333 PAGEMILL RD | | |
| City | | State TX   Zip | City   DALLAS | | State   TX   Zip   75343 | |

| 27 | 28. Description of Merchandise | | | 32. | 33. | 34.<br>Duty and I.R. Tax |
|---|---|---|---|---|---|---|
| Line<br>No. | 29.<br>A. HTSUS Number<br>B. ADA/CVD Number | 30.<br>A. Gross Weight<br>B. Manifest Qty. | 31.<br>Net Quantity in<br>HTSUS Units | A. Entered Value<br>B. CHGS<br>C. Relationship | A. HTSUS Rate<br>B. ADA/CVD Rate<br>C. IRC Rate<br>D. Visa Number | Dollars          Cents |
| | I.T. DATE   I.T. NO.<br>04/04/20   VVS06191332 | MASTER BILL/AWB<br>EGLV146000082958 | HOUSE BILL | SUBHOUSE BILL | | BILL QTY<br>654 CT |
| 001 | Invoice Number  001/CU005AO<br>ARTICLE OF CHINA,US NTE 20(F)<br>9903.88.03            1368 KG | | | N<br>0<br>C476 | 25% | 2,577.25 |
| | KNIVES OTH. W/OTH THAN FIX<br>8211.93.0060          10944.00 NO | | | 10,309 | 3¢/NO + 5.4% | 885.01 |
| | 499 MERCHANDISE PROCESSING FEE (MPF) | | | | 0.3464% | 35.71 |
| | 501 HARBOR MAINTENANCE FEE (HMF) | | | | 0.125% | 12.89 |

39.     BNSF is not a passive participant in the importation process. BNSF is required to

scour the Importer Defendants' invoices, translating internal product numbers to HTS codes and

applying the appropriate customs duties. BNSF then pays the duties owed for each shipment and

bills ADCO for the charges, plus an administrative fee.

40.    As the Importer Defendants' agent, BNSF certifies to the government that "the prices set forth in the invoices are true," and that the values in each entry summary "are true and correct."   BNSF is required to ensure these statements are correct before submitting such certifications.

## V.    DEFENDANTS' SCHEME TO DEFRAUD THE UNITED STATES

41.    To avoid the payment of customs duties, Defendants have engaged in a deliberate scheme to fraudulently underpay customs duties owed to the Government in connection with products imported into the United States, by making false representations on entry documents filed with CBP about the value of the imported merchandise.

42.    Defendants have used a well-known fraudulent scheme known as "double-invoicing."  In a double-invoicing scheme, the importer and exporter maintain two sets of records.  One set of invoices shows the price for the goods that the importer actually pays.  Another set of invoices, reflecting a falsely lower price for the goods, is used to submit entry summaries to CBP.

43.    Defendants have fraudulently underreported the value of their products on the documents submitted to CBP during the entry process.  They have accomplished this goal by reducing the reported value of each item by a certain percentage, even though the actual value of each item has not changed.  To conceal their misconduct, these falsified product values have appeared on both the entry summary and the commercial invoices submitted to CBP.  XTM then has sent the Importer Defendants an additional dummy invoice for invented services that Defendants have wrongly believed are not subject to customs duties.  XTM has not actually performed or charged for these additional services.  Rather, the dummy invoices have been used to bill the Importer Defendants for the difference between the fraudulently underreported value of the goods (reported to CBP) and the actual value of the goods.

44.     Defendants have been required to pay customs duties only on the value of the goods reported to CBP.  By underreporting this value, Defendants have been able to fraudulently avoid paying the customs duties they owe.

### A.     THE U.S.-CHINA TRADE WAR AND ITS EFFECTS ON IMPORTERS

45.     The Importer Defendants purchase the vast majority of their products that they sell from XTM, located in China.  Until September 2018, all of the products purchased and imported by the Importer Defendants were subject to baseline duties, without any additional charges for importing the goods from China.  However, the escalating trade war between the United States and China soon meant that the Importer Defendants would be required to pay a steep price to continue to import their goods.

46.     Section 301 of the Trade Act of 1974 authorizes the United States Trade Representative ("USTR") to investigate a foreign country's trade practices.  19 U.S.C. § 2411(b).  On August 18, 2017, Robert Lighthizer, who then served as USTR, initiated such an investigation concerning China's laws, policies, practices, and actions related to intellectual property, innovation, and technology.  On March 22, 2018, the USTR released a report announcing the results of its investigation, finding that the Chinese government's actions were unreasonable or discriminatory and burden or restrict U.S. commerce.

47.     On April 6, 2018, the USTR announced that it intended to impose "an additional duty of 25 percent on a list of products of Chinese origin." *Notice of Determination and Request for Public Comment Concerning Proposed Determination of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation,* 83 Fed. Reg. 14906, 14907 (Apr. 6, 2018).  These products became known as "List 1."  The additional 25% duty went into effect on June 20, 2018.

48.     At the same time that it finalized List 1, the USTR announced that it intended to impose an additional 25% duty on another group of products, commonly known as "List 2." *Notice of Action and Request for Public Comment Concerning Proposed Determination of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg. 28710, 28711-12 (June 20, 2018). These duties went into effect on August 16, 2018. *Notice of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg. 40823, 40823-24 (Aug. 16, 2018).

49.     List 1 and List 2 did not affect the Importer Defendants, as none of the products they import were included on those lists. However, nearly all of the Importer Defendants' products would soon be included on List 3, which imposed tariffs in two stages, beginning with 10%, then increasing to 25%.

50.     In response to the USTR's actions with respect to List 1 and List 2, the Chinese government retaliated by imposing 25% *ad valorem* tariffs on $50 billion in U.S. goods implemented in two stages. On July 6, 2018, when the United States began imposing 25% tariffs on List 1, the Chinese government imposed $34 billion worth of retaliatory tariffs. On August 23, 2018, when the United States began imposing 25% tariffs on List 2, the Chinese government imposed $16 billion worth of retaliatory tariffs.

51.     About a week after China imposed its first round of retaliatory tariffs, the USTR published notice of its proposal to impose "an additional 10 percent *ad valorem* duty on [a list of] products [from] China with an annual trade value of approximately $200 billion." *Request for Comments Concerning Proposed Modification of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 83

13

Fed. Reg. 33608, 33608 (proposed July 17, 2018). These products are commonly known as "List 3." All of the products relevant to this Complaint are on List 3. The List 3 tariffs are collectively imposed under HTS code 0093.88.03.

52.     Soon after its initial proposal with respect to List 3, the USTR proposed "raising the level of the additional duty in the proposed supplemental action from 10 percent to 25 percent." *Extension of Public Comment Period Concerning Proposed Modification of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg. 38760, 38760 (proposed Aug. 7, 2018). Eventually, the USTR decided to impose the additional tariffs in two stages. Beginning on September 24, 2018, the USTR imposed a 10% *ad valorem* tariff on items in List 3, which was due to increase to 25% on January 1, 2019. *Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg. 47974, 47974 (Sept. 21, 2018).

53.     In the months that followed, China and the United States attempted to resolve their differences through trade negotiations. Based on the progress made with China in those negotiations, the United States announced in December 2018, and again in March 2019, that it would delay the scheduled increase in the List 3 duty rate from 10 to 25%. *Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg. 65198 (Dec. 19, 2018); *Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 84 Fed. Reg. 7966 (Mar. 5, 2019).

54.     The trade negotiations ultimately were unsuccessful. In May 2019, the USTR announced its intent to raise the tariff rate on List 3 goods to 25%, effective either May 10, 2019

or June 1, 2019, depending on the day of export. *See Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 84 Fed. Reg. 20459 (May 9, 2019); *see also Implementing Modification to Section 301 Action: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 84 Fed. Reg. 21892 (May 15, 2019). These tariffs took effect as scheduled and remain in force today, with the exception of various exclusions that are not relevant to the products at issue in this case.

### B.   THE FRAUDULENT SCHEME

55.   Defendants monitored the escalating trade war and the potential effects it would have on their businesses. For the Importer Defendants, higher duties would mean higher prices for the goods they imported, which would need to be absorbed (leading to reduced profits) or passed along to their customers (potentially leading to lost business)—both unpleasant alternatives. For XTM, higher duties could lead to their customers in the United States seeking to do business elsewhere. For BNSF, higher duties meant that some of their customers might substantially reduce their level of importation or be forced out of business entirely. Every Defendant had a strong financial interest in evading or helping others to evade the List 3 tariffs.

56.   When the List 3 tariffs were announced, Defendant Davis instructed Relator Reznicek to compile a list of the HTS codes corresponding to the Importer Defendants' most popular products and the duty rates the Importer Defendants were currently paying. Reznicek did as he was instructed and provided the list to Davis. Davis used this list to conspire with XTM and BNSF to evade the duties owed.

57.   When the List 3 tariffs were first imposed in September 2018, the Importer Defendants raised the prices of some of their boxcutter products, but otherwise did not take any action. Although they were forced to pay an additional 10% in duties for nearly all of their

15

products, they generally charged their customers the same prices as before, absorbing the cost of the increased duties.

58.     However, after several months of reduced profits, and with tariff rates about to climb from 10% to 25%, the Importer Defendants determined that they could no longer absorb these increased costs and keep their prices the same. The Importer Defendants could follow the law and increase prices for their customers or find cheaper goods to import, or they could break the law and find a way to avoid paying the duties they owed. The Importer Defendants chose the latter option.

59.     Before the 25% tariffs took effect in mid-2019, Defendant Davis communicated with Calvin Chang, a member of XTM's upper management with whom Davis has worked closely for decades. Together, the Importer Defendants and XTM devised a scheme whereby XTM would pretend its goods had substantially decreased in value. These products maintained the same product numbers on XTM's invoices, but XTM appended a letter to the end of each product number corresponding to the discount amount. Specifically, product numbers ending with a "F" were reduced to fifty percent of their prior value and product numbers ending with an "S" were reduced to sixty percent of their prior value. XTM made these changes across nearly the entire line of products it sold to the Importer Defendants.

60.     In reality, the value of the products had not changed; they were reported as cheaper only to avoid paying the List 3 tariffs. To ensure XTM was paid for the full value of the goods, XTM prepared dummy invoices for invented charges such as "container freight & insurance," "storage & handling," "tooling cost," and "engineering." These charges did not correspond to any actual services provided by XTM. Rather, Defendants chose to bill to these categories because

16

they believed these sorts of charges were not subject to duties.  These dummy invoices matched the cumulative discount for every product in each shipment.

      61.    The following examples illustrate how the scheme operated to artificially deflate the value of the imported products, enabling Defendants to avoid paying appropriate customs duties to the United States. These examples represent only a small fraction of the total number of fraudulent entry records submitted by Defendants to CBP in connection with shipments of goods from overseas.

      62.    In mid-2019, XTM began to falsely reduce the value of their items and assigned each item with a new item number. The items had not significantly changed in appearance or quality, but, instead, reflected the percent of the value each item had been reduced to.  For the new item numbers, a leading zero generally is replaced with a nine and a letter is appended to the end of the item number corresponding to the percentage discount.  For instance, the following items were shipped from XTM to the Importer Defendants in January 2021:

| Item | Old # | Unit Price | New # | Unit Price | Discount |
|---|---|---|---|---|---|
| Lowes Custom Safety Box Cutter | 09310 | $2.225 | 99310S | $1.335 | 40% |
| EasyCut Replacement Blade | 09703 | $2.91 | 99703S | $1.746 | 40% |
| EasyCut (Cosco) | 091524 | $1.68 | 991524S | $1.008 | 40% |
| EasyCut 1000 Safety Cutter (Red) | 09777 | $1.57 | 99777S | $0.942 | 40% |
| EasyCut Blade (10 Blade) | 09605 | $0.42 | 99605S | $0.252 | 40% |
| EasyCut (Garvey without Holster) | 91508 | $1.11 | 991508S | $0.660 | 40% |
| EasyCut 1000 Safety Cutter (Blue) | 09780 | $1.57 | 99780S | $0.942 | 40% |

Because all of these item numbers end with an "S," the new value is 60% of the old value, for a discount of 40%.

      63.    On January 15, 2021, XTM sent Invoice CV001AO to ADCO, for a shipment sailing on or about January 18, 2021. The invoice included various amounts of the aforementioned products, for a total charge of $186,792.91:

| ITEM NO. | DESCRIPTION OF GOODS | QTY | | U/P | AMOUNT |
|---|---|---|---|---|---|
| | CONTAINER NO.: TLLU5417307 | | | | |
| #99310S | Lowes Custom Safety Box Cutter/HD Blades | 39,456 | Ea | 1.335 | 52,673.76 |
| #99703S | CUT BLADE | 13,560 | Pk | 1.746 | 23,675.76 |
| #991524S | EASYCUT (COSCO) | 30,000 | PCS | 1.008 | 30,240.00 |
| #99777S | EASYCUT 1000 RED | 30,096 | Ea | 0.942 | 28,350.43 |
| #99605s | EASYCUT BLADE (10 BLADE) | 25,080 | PCS | 0.252 | 6,320.16 |
| #991508S | EASYCUT (GARVEY WITHOUT HOLSTER) | 48,000 | PCS | 0.666 | 31,968.00 |
| #99780S | EASYCUT 1000 BLUE | 14,400 | Ea | 0.942 | 13,564.80 |
| TOTAL : | | | | | 186,792.91 |

64.     XTM sent this invoice to BNSF, which calculated the duties owed.  Every item was subject to a baseline duty of one to three cents per item plus 5.4% of the product's value, a merchandise processing fee of 0.3465% of the product's value, and a harbor maintenance fee of 0.125% of the product's value.  In addition, every item was subject to an additional 25% tariff for being an "article of China."  BNSF calculated the duties owed based on the product values as reported by XTM and completed the CBP entry summary form with a separate entry for each item.

65.     For example, the following entry corresponds to the Lowes Custom Safety Box Cutter.  The shipment contained 39,456 units at a stated value of $1.335 per unit for a total stated value of $52,674 (rounding up to the nearest dollar).  This stated value was then subject to a baseline duty of three cents per item plus 5.4%, a merchandise processing fee of 0.3465% and a harbor maintenance fee of 0.125% of the product's value, and a 25% tariff, for a total charge of $17,444.88:

| 27 | 28. Description of Merchandise | | | 32. | 33. | 34. Duty and I.R. Tax | |
|---|---|---|---|---|---|---|---|
| Line No. | 29. A. HTSUS Number B. ADA/CVD Number | 30. A. Gross Weight B. Manifest Qty. | 31. Net Quantity in HTSUS Units | A. Entered Value B. CHGS C. Relationship | A. HTSUS Rate B. ADA/CVD Rate C. IRC Rate D. Visa Number | Dollars | Cents |
| | I.T. DATE  I.T. NO. 02/11/21   W8087M83 | MASTER BILL/AWB EGLV146001423341 | HOUSE BILL | | SUBHOUSE BILL | BILL QTY 2530 CT | |
| 001 | Invoice Number  001/CV011AO ARTICLE OF CHINA,US NTE 20(F) 9903.88.03            5278 KG | | | N | 25% | 13,168.50 | |
| | | | | 0 C1964 | | | |
| | KNIVES OTH, WIDTH THAN FIX 8211.93.0060 | | 39456.00 NO | 52,674 | 3c/NO + 5.4% | 4,028.08 | |
| | 499 MERCHANDISE PROCESSING FEE (MPF) | | | | 0.3464% | 182.46 | |
| | 501 HARBOR MAINTENANCE FEE (HMF) | | | | 0.125% | 65.84 | |

66.     In reality, this item had a value of $2.225 per unit, and the total stated value should have been $87,790.  Applying the appropriate value, the Importer Defendants should have paid $5,924.34 in baseline duties, $304.10 in merchandise processing fees, $109.74 in harbor maintenance fees, and $21,947.50 in additional tariffs, for a total of $28,285.68.  The Importer Defendants thus fraudulently avoided paying $10,840.80 in duties and fees for this product.

67.     In total, the Importer Defendants purchased a reported value of $186,793 in goods and paid the United States $73,639[1] in duties and fees for this shipment on or about March 4, 2021.

68.     In reality, the value of the goods was, and should have been reported as, $311,323 (rounding to the nearest dollar for each item).  The Importer Defendants should have paid $112,202.73 in duties and fees for this shipment.  Defendants thus defrauded the United States of nearly $40,000 for this shipment alone.

69.     To conclude the payment cycle for this shipment, all that remained was for the Importer Defendants to pay XTM the remaining 40% of the value of the goods.  Defendants knew the total value of the goods was $311,321.51.[2]  The Importer Defendants had been charged $186,792.91—60% of the total.  The forty percent discount totaled $124,528.60.

70.     XTM thus provided another invoice for three invented charges: "CONTAINER FRIGHT [sic] & INSURANCE," "STORAGE & HANDLING CHARGE," and "ENGINEERING CHARGE."  The value of these charges added up to $124,528.60, matching the amount of the 40% discount to the penny:

---

[1] BNSF apparently made a mathematical error, underreporting the total merchandise processing fees owed by $118.71.

[2] The entry summary requires the value of each item to be rounded to the nearest dollar. Therefore, this figure diverges slightly from the total value that should have been reported on the entry summary.

| ITEM NO. | DESCRIPTION OF GOODS | QTY | U/P | AMOUNT |
|---|---|---|---|---|
| | CONTAINER FRIGHT & INSURANCE | 1 | 5,800.000 | 5,800.00 |
| | STORAGE & HANDLING CHARGE | | | 45,923.00 |
| | ENGINEERING CHARGE | | | 72,805.60 |
| TOTAL: | | | | 124,528.60 |

71.     Defendants have repeated this scheme for every shipment from China since approximately June 2019. In total, Defendants have fraudulently underreported the value of their imports by approximately $4 million, thus avoiding paying approximately $1 million in duties and fees.

## VI.    DEFENDANTS CONSPIRED TO DEFRAUD THE UNITED STATES

72.     As alleged in this Complaint, one facet of Defendants' scheme involved coordinating with BNSF and Axiom (the "Co-Conspirators") to further the overall fraudulent representations about the customs duties owed through a pattern and practice of false and misleading representations ("overt acts").

73.     The overt acts included the submission to CBP by these Co-Conspirators of knowingly false certifications. As a result of these false certifications, Defendants knowingly and fraudulently evaded millions of dollars of customs duties owed on goods imported from China.

74.     Besides Defendants, the Co-Conspirators include other entities through which Defendants have conducted their fraudulent scheme.

75.     For example, during its years-long relationship with the Importer Defendants, the Co-Conspirators have developed an encyclopedic knowledge of the Importer Defendants' product numbers and prices, most of which have not changed until the development of the fraudulent scheme identified in this Complaint. The Co-Conspirators have further kept abreast of legal developments that will affect its customers, such as the retaliatory tariffs that imposed a 25%

additional duty on the Importer Defendants' products. In fact, it was a Senior Entry Writer at BNSF who informed Relator Reznicek that the 25% duty rate was set to take effect in mid-2020.

76.     The Co-Conspirators knowingly assisted the Importer Defendants to carry out their fraudulent scheme. The value of the Importer Defendants' products dropped by identical 40% or 50% increments across the entire product line shortly after the 25% duty rate took effect. BNSF, which had been assisting the Importer Defendants navigate the customs process for years, noticed these sudden and suspiciously timed changes. Nevertheless, BNSF did not conduct any investigation or make any serious inquiries into the nature or timing of these changes. Instead, in reckless disregard of the truth, the Co-Conspirators have diligently continued to complete the entry summaries—and pay fraudulently reduced duty and fee amounts—according to clearly artificially deflated invoices.

77.     Defendants and their Co-Conspirators shared in the conspiratorial objective to deceive the United States concerning the customs duties owed, and further agreed and intended to each perform and to each benefit from these unlawful overt acts in furtherance of Defendants' scheme.

78.     Through the acts and omissions described in this Complaint, and from at least June 2019 to the present, Defendants, with each other and with their Co-Conspirators known and unknown, agreed and conspired to defraud the Government by knowingly making, using, or causing to be made or used, a false record or statement material to an obligation to pay or transmit money to the Government, and knowingly concealed and knowingly and improperly avoided or decreased an obligation to pay or transmit money to the Government.

VII.    CAUSES OF ACTION

**COUNT I**
**(Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(G))**

79.    Relator incorporates by reference each of the preceding paragraphs as though fully set forth herein.

80.    Defendants knowingly made, used, or caused to be made or used false records and/or statements to conceal, avoid, or decrease obligations to pay or transmit money or property, in the form of customs duties, to the United States, in violation of 31 U.S.C. § 3729(a)(1)(G).

81.    The Government has incurred losses in the form of customs duties underpaid by Defendants because of their wrongful and fraudulent conduct.

**COUNT II**
**(Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(C))**

82.    Relator incorporates by reference each of the preceding paragraphs as though fully set forth herein.

83.    Defendants conspired to knowingly make, use, or cause to be made or used false records and/or statements to conceal, avoid, or decrease obligations to pay or transmit money or property, in the form of customs duties, to the United States, in violation of 31 U.S.C. § 3729(a)(1)(C).

84.    Defendants shared a plan whose conspiratorial objective was to fraudulently reduce the amount of customs duties owed by the Importer Defendants. Each Defendant shared in this general conspiratorial objective. Each Defendant committed at least one overt act in furtherance of the conspiracy, including, but not limited to, the following:

- The Importer Defendants engaged in discussions with XTM regarding how to avoid paying the duties owed on the Importer Defendants' products. Together, they formulated and executed a plan whereby XTM submitted to the Importer Defendants two invoices for each

22

shipment: one reflecting a falsely reduced value for the products at issue, and another reflecting the discount amount that the Importer Defendants would pay to make XTM whole. The Importer Defendants paid these invoices as planned. The Importer Defendants instructed BNSF to execute CBP entry summaries based on fraudulent data.

- XTM engaged in discussions with the Importer Defendants regarding how to avoid paying the duties owed on the Importer Defendants' products. Together, they formulated and executed a plan whereby XTM submitted to the Importer Defendants two invoices for each shipment: one reflecting a falsely reduced value for the products at issue, and another reflecting the discount amount that the Importer Defendants would pay to make XTM whole.

- The Co-Conspirators understood that the higher duty rates on the products at issue would adversely affect the Importer Defendants' and XTM's business. The Co-Conspirators noticed that XTM had suddenly and uniformly reduced the prices for nearly all of its products by forty or fifty percent. The Co-Conspirators noticed that these price reductions occurred almost immediately after the List 3 tariffs went into effect on XTM's products. The Co-Conspirators affirmatively decided not to conduct any investigation or make any serious inquiries into the nature or timing of these changes. Instead, the Co-Conspirators continued to complete the entry summaries—and pay fraudulently reduced duty and fee amounts—according to clearly artificially deflated invoices.

## VIII.  PRAYER FOR RELIEF

WHEREFORE, Relators respectfully request that judgment be entered in their favor and against Defendants as follows:

A. Treble the Government's damages in an amount to be determined at trial and such civil penalties as are required by law, pursuant to 31 U.S.C. § 3729(a);

B. An award of costs and fees, pursuant to 31 U.S.C. §§ 3729(a)(3) & 3730(d); and

C. Such further relief as is proper.

## IX.   JURY TRIAL DEMAND

Relators demand a trial by jury of all issues so triable.

Dated: February 10, 2022

Cary L. McDougal (Bar No. 13569600)
cmcdougal@baronbudd.com
**BARON & BUDD, P.C.**
3102 Oak Lawn Ave., Suite 1100
Dallas, TX 75219
Telephone: 214.521.3605
Facsimile: 214.520.1181

Andrew M. Miller (Bar No. 24041483)
amiller@baronbudd.com
Noah M. Rich  (*pro hac vice* pending)
nrich@baronbudd.com
**BARON & BUDD, P.C.**
600 New Hampshire Ave. NW, 10th Floor
Washington, DC 20037
Telephone: 202.333.4562
Facsimile: 202.337.1039

3-22CV0332-G

JS 44 (Rev. 10/20) - TXND (10/20)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

United States ex rel. Donald Reznicek and Colleen McFarland

**DEFENDANTS**

Dalloo Marketing, Inc. d/b/a ADCO Industries, Phoenix Operations, L.P., Raymond E. Davis, Xiamen Atlantis MFC Co., Ltd., Xiamen Taft Medical Co., Ltd., Far East Industries, Inc., and John Does #1-50, Fictitious Names

**(b)** County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   Dallas County, TX
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Cary L. McDougal
Baron & Budd, P.C.
3102 Oak Lawn Ave., Suite 1100, Dallas, TX 75219
Telephone: 214.521.3605

Attorneys *(If Known)*

FEB 10 2022
mo

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | | | |
|---|---|---|---|
| [x] 1 | U.S. Government Plaintiff | [ ] 3 | Federal Question *(U.S. Government Not a Party)* |
| [ ] 2 | U.S. Government Defendant | [ ] 4 | Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)* and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| [ ] 110 Insurance | **PERSONAL INJURY** | [ ] 625 Drug Related Seizure of Property 21 USC 881 | [ ] 422 Appeal 28 USC 158 | [ ] 375 False Claims Act |
| [ ] 120 Marine | [ ] 310 Airplane | [ ] 690 Other | [ ] 423 Withdrawal 28 USC 157 | [x] 376 Qui Tam (31 USC 3729(a)) |
| [ ] 130 Miller Act | [ ] 315 Airplane Product Liability | | | [ ] 400 State Reapportionment |
| [ ] 140 Negotiable Instrument | [ ] 320 Assault, Libel & Slander | | **PROPERTY RIGHTS** | [ ] 410 Antitrust |
| [ ] 150 Recovery of Overpayment & Enforcement of Judgment | [ ] 330 Federal Employers' Liability | | [ ] 820 Copyrights | [ ] 430 Banks and Banking |
| [ ] 151 Medicare Act | [ ] 340 Marine | | [ ] 830 Patent | [ ] 450 Commerce |
| [ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans) | [ ] 345 Marine Product Liability | | [ ] 835 Patent - Abbreviated New Drug Application | [ ] 460 Deportation |
| | | | [ ] 840 Trademark | [ ] 470 Racketeer Influenced and Corrupt Organizations |
| [ ] 153 Recovery of Overpayment of Veteran's Benefits | [ ] 350 Motor Vehicle | | [ ] 880 Defend Trade Secrets Act of 2016 | [ ] 480 Consumer Credit (15 USC 1681 or 1692) |
| [ ] 160 Stockholders' Suits | [ ] 355 Motor Vehicle Product Liability | **PERSONAL PROPERTY** | | |
| [ ] 190 Other Contract | [ ] 360 Other Personal Injury | [ ] 370 Other Fraud | **LABOR** | [ ] 485 Telephone Consumer Protection Act |
| [ ] 195 Contract Product Liability | | [ ] 371 Truth in Lending | [ ] 710 Fair Labor Standards Act | [ ] 490 Cable/Sat TV |
| [ ] 196 Franchise | [ ] 362 Personal Injury - Medical Malpractice | [ ] 380 Other Personal Property Damage | [ ] 720 Labor/Management Relations | **SOCIAL SECURITY** [ ] 850 Securities/Commodities/ Exchange |
| | | [ ] 385 Property Damage Product Liability | [ ] 740 Railway Labor Act | [ ] 861 HIA (1395ff) |
| | **PERSONAL INJURY** | | [ ] 751 Family and Medical Leave Act | [ ] 862 Black Lung (923) [ ] 890 Other Statutory Actions |
| **REAL PROPERTY** | [ ] 365 Personal Injury - Product Liability | | [ ] 790 Other Labor Litigation | [ ] 863 DIWC/DIWW (405(g)) [ ] 891 Agricultural Acts |
| [ ] 210 Land Condemnation | [ ] 367 Health Care/ Pharmaceutical Personal Injury Product Liability | **CIVIL RIGHTS** | [ ] 791 Employee Retirement Income Security Act | [ ] 864 SSID Title XVI [ ] 893 Environmental Matters |
| [ ] 220 Foreclosure | [ ] 368 Asbestos Personal Injury Product Liability | [ ] 440 Other Civil Rights | | [ ] 865 RSI (405(g)) [ ] 895 Freedom of Information Act |
| [ ] 230 Rent Lease & Ejectment | | [ ] 441 Voting | **PRISONER PETITIONS** | **FEDERAL TAX SUITS** [ ] 896 Arbitration |
| [ ] 240 Torts to Land | | [ ] 442 Employment | **Habeas Corpus:** | [ ] 870 Taxes (U.S. Plaintiff or Defendant) [ ] 899 Administrative Procedure |
| [ ] 245 Tort Product Liability | | [ ] 443 Housing/ Accommodations | [ ] 463 Alien Detainee | [ ] 871 IRS—Third Party 26 USC 7609    Act/Review or Appeal of Agency Decision |
| [ ] 290 All Other Real Property | | [ ] 445 Amer. w/Disabilities - Employment | [ ] 510 Motions to Vacate Sentence | [ ] 950 Constitutionality of State Statutes |
| | | [ ] 446 Amer. w/Disabilities - Other | [ ] 530 General | |
| | | [ ] 448 Education | [ ] 535 Death Penalty | **IMMIGRATION** |
| | | | [ ] 540 Mandamus & Other | [ ] 462 Naturalization Application |
| | | | [ ] 550 Civil Rights | [ ] 465 Other Immigration Actions |
| | | | [ ] 555 Prison Condition | |
| | | | [ ] 560 Civil Detainee - Conditions of Confinement | |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| [x] 1 Original Proceeding | [ ] 2 Removed from State Court | [ ] 3 Remanded from Appellate Court | [ ] 4 Reinstated or Reopened | [ ] 5 Transferred from Another District *(specify)* | [ ] 6 Multidistrict Litigation - Transfer | | [ ] 8 Multidistrict Litigation - Direct File |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
31 U.S.C. § 3730(b)(1)
Brief description of cause:
False Claims against the United States

## VII. REQUESTED IN COMPLAINT:

[ ] CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $ _____

CHECK YES only if demanded in complaint:
JURY DEMAND: [x] Yes  [ ] No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*  JUDGE _____  DOCKET NUMBER _____

DATE
2/10/22

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____